[No. G030880. Fourth Dist., Div. Three. Dec. 19, 2003.]

JEFFREY WILENS et al., Plaintiffs and Appellants, v.
TD WATERHOUSE GROUP, INC., et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Jeffrey P. Spencer and Jeffrey P. Spencer for Plaintiffs and Appellants.

Paul, Hastings, Janofsky & Walker and Howard M. Privette for Defendants and Respondents.

**OPINION**

**SILLS, P. J.**—Jeffrey Wilens sued TD Waterhouse Group, Inc. and Waterhouse Securities, Inc. (collectively, Waterhouse) for damages he allegedly incurred when his access to the Waterhouse Internet stock trading service was suspended without notice. He appeals from the order denying his motion to certify the action as a statewide class action for violations of the Consumer Legal Remedies Act (Civ. Code, § 1781) and the unfair competition law (Bus. & Prof. Code, § 17200) and as a nationwide class action for breach of contract. We affirm.

## FACTS

Waterhouse is a large discount securities broker that provides financial services to individual investors, including Internet access to stock trading through its "webBroker" trading site. Investors can also conduct stock trading by using the TradeDirect automated telephone service or by contacting an account officer at a branch office. The commission charged for trading varies with the method used; online trading costs the least and in-person trading the most. Investors desiring access to Internet trading must sign an online trading agreement with Waterhouse in which it reserves the right "in its sole discretion, to terminate your access to Waterhouse webBroker and/or your license to the Software, in whole or in part, at anytime, without notice, for any reason whatsoever . . . ."

Wilens opened a Waterhouse account with webBroker access in 1998 and was a frequent trader. On the morning of April 13, 2000, Wilens claims he attempted to sell some stocks below the market price through webBroker but was prevented from doing so because his trading privileges had been terminated. He contacted his account officer, as directed, but had to wait "about 12 minutes for a broker to answer the phone . . . . By that time, the price of the stock had dropped well below the aforementioned order price." Waterhouse employees allegedly concluded Wilens's trading access had been suspended because of a margin call, but admitted the margin call had been resolved the previous day and should not have interfered with his trading ability that morning. "When defendants refused to honor the price I would have received over the web site, I mitigated the damage by selling at a slightly more favorable price later in the day. However, I still suffered a loss of $20,000, compared to the price I could have gotten initially that morning." Wilens claims he received no pretermination notice "or even notice contemporaneous with the termination. With such notice, I could have corrected the problem with my account or could have made other arrangements to make the trade without using webBroker such as going to a broker before the market opened to place the trade in person or calling before the market opened and ask[ing] to be allowed to keep an 'open line.' "

In his first amended complaint, Wilens alleges that Waterhouse's right to terminate the webBroker agreement for any reason without notice is an unconscionable contractual provision and constitutes a violation of the Consumer Legal Remedies Act (Civ. Code, § 1770, subd. (a)(19)), unfair competition (Bus. & Prof. Code, § 17200), and breach of contract. He claims to be a member of a similarly situated class of persons, defined as "[p]ersons who have or had Waterhouse stock trading accounts within four years preceding the filing of this Complaint which are or were enabled for webBroker access and who signed an Account Agreement containing one or more of the alleged unconscionable provisions. This class includes a subclass of persons whose webBroker access was suspended without cause for some period of time."

Wilens claims he and the class members have sustained "actual damages, including general damages, by being subjected to a violation of their rights under the Consumer Legal Remedies Act"; "severe emotional and psychological distress, anguish, anxiety, and injury, and pain and suffering, for which they are entitled to compensation in an amount to be shown according to proof "; and "special damages [consisting of] economic loss caused by loss of the ability to enter timely trade orders resulting in less favorable transaction prices," in an amount to be shown according to proof. Wilens further alleges that "[c]ertain of the class members qualify to receive enhanced damages in the form of treble damages and a civil penalty up to $5,000 pursuant to Civil Code sections 3345 and subdivision (b) of section 1780, respectively."

After Waterhouse answered the complaint, the parties conducted discovery regarding class issues. Waterhouse had over 1.7 million webBroker customers as of May 2001. The provision allowing it to terminate a customer's access to the service for any reason without notice had been included in the agreement since January 1997, although Waterhouse stated it "ordinarily makes every attempt to provide a customer with notice before it suspends access to the account." Some of the reasons for terminating access include: "(1) an unsecured debit; (2) a New York Stock Exchange ('NYSE') margin call; (3) a 90-day NYSE stock restriction; (4) a TDW house call; (5) an account transfer; (6) the closure of an account; (7) notification of a divorce; (8) notification of death; and (9) a court order."

Under court supervision, the parties hired an independent third party to send an e-mail communication to webBroker customers, informing them about the class action lawsuit and asking if their access had been interrupted by Waterhouse during the previous four years. If so, the customers were asked to fill out a questionnaire about notice, reasons for the interruption, and resulting financial losses. Waterhouse provided e-mail addresses for 500,000 of its 1.7 million webBroker customers. More than 1,900 people responded, including

511 California residents. About 1,800 people, including 476 California residents, said their trading access to webBroker had been suspended or terminated without notice, and 1,344 of those claimed to have suffered losses.

In Wilens's motion for class certification, he redefined the class as "Defendants' webBroker customers within four years preceding the filing of the Complaint to present. This class includes a subclass of persons whose webBroker access was suspended without notice. The class is nationwide as to the breach of contract claim but limited to California residents on the remaining claims." The motion was heard in April 2002. The trial court expressed its concern about certification because "there are just too many variables to the individual claims and we would be trying perhaps several hundred separate lawsuits." The parties presented argument, and the trial court ruled: "[T]he court finds that the nature of the claims and the possible resultant damages in the nationwide class and any subclass are substantially dissimilar to not warrant a class certification."

## DISCUSSION

■ Class actions are designed to adjudicate the claims of many individuals at the same time, thereby eliminating the possibility of repetitious litigation and providing small claimants with a method of obtaining redress for claims that would otherwise be too small to warrant individual litigation. (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469 [174 Cal.Rptr. 515, 629 P.2d 23].) "But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the court." ' [Citation.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27].)
■ On review of a ruling on class certification, we will affirm the trial court so long as the ruling is supported by substantial evidence and is not based on improper criteria or erroneous legal assumptions. (*Richmond v. Dart Industries, Inc.*, *supra*, 29 Cal.3d at p. 470.) Thus, "[o]ur task on appeal is not to determine in the first instance whether the requested class is appropriate but rather whether the trial court has abused its discretion in denying certification." (*Osborne v. Subaru of America, Inc.* (1988) 198 Cal.App.3d 646, 654 [243 Cal.Rptr. 815].)

### *Class Certification Under the Consumer Legal Remedies Act*

Wilens first contends the trial court erroneously denied certification of the class under the Consumer Legal Remedies Act (CLRA). He claims the trial court's basis for the denial—that the individual claims were "substantially dissimilar"—is not supported by substantial evidence. We disagree.

■ The CLRA makes unlawful certain "unfair methods of competition and unfair or deceptive acts or practices" used in the sale of goods or services to a consumer. (Civ. Code, § 1770, subd. (a).) If the consumer suffers damage as a result of an unlawful act, the consumer can bring an action against the defendant for actual damages, punitive damages, injunctive relief or restitution. Additionally, if the consumer is a senior citizen or disabled, he may be awarded an additional sum of money if he has suffered "substantial physical, emotional, or economic damage" as a result of the defendant's conduct. (Civ. Code, § 1780, subds. (a) & (b).) Here, Wilens alleges Waterhouse violated the CLRA by "[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve" and "[i]nserting an unconscionable provision in the contract." (Civ. Code, § 1770, subd. (a)(14) & (19).)

■ An injured consumer may bring an action against the defendant on behalf of himself and other consumers if others have suffered damage from the unlawful act so long as: "(1) It is impracticable to bring all members of the class before the court. [¶] (2) The questions of law or fact common to the class are substantially similar and predominate over the questions affecting the individual members. [¶] (3) The claims or defenses of the representative plaintiffs are typical of the claims or defenses of the class. [¶] (4) The representative plaintiffs will fairly and adequately protect the interests of the class." (Civ. Code, § 1781, subds. (a) & (b).) The trial court here determined the second statutory requirement was lacking.

The putative class consists of webBroker customers who were subject to the provision allowing Waterhouse to terminate Internet trading access without notice. Wilens contends all the class members share a common question of law, i.e., whether the termination provision is unconscionable. He argues unconscionability can be determined on a classwide basis without resolution of individual factual questions.

■ A contract term is unenforceable if it is both procedurally and substantively unconscionable. Procedural unconscionability is satisfied by a determination that the contract is adhesive, i.e., "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." (*Armendariz v. Foundation Health Psychcare Services* (2000) 24 Cal.4th 83, 113 [99 Cal.Rptr.2d 745, 6 P.3d 669].) Waterhouse admits the termination provision is part of its standard contract and is nonnegotiable, thus, the webBroker agreement is clearly a contract of adhesion.

■ An adhesion contract will be considered substantively unconscionable if it is unduly "one-sided" in favor of the stronger party. " '[A] contract or

provision which does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him. . . . [E]ven if consistent with the reasonable expectations of the parties, [a contract or provision] will be denied enforcement if, considered in its context, it is unduly oppressive or "unconscionable." ' (*Ibid.*)" (*Armendariz v. Foundation Health Psychcare Services, supra,* 24 Cal.4th at p. 113.) Arguably, the webBroker termination provision qualifies. The provision is buried in a lengthy agreement in very small print and could be considered unfair and oppressive.[1]

■   Waterhouse concedes all webBroker customers were required to sign an agreement containing the termination without notice provision. Thus, the determination of unconscionability is an issue common to the class. Wilens, however, must show that common issues not only exist, but also will *predominate* over individual ones. " '[T]his means "each member must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants." ' " (*Lockheed Martin Corporation v. Superior Court* (2003) 29 Cal.4th 1096, 1108 [131 Cal.Rptr.2d 1, 63 P.3d 913].)

The trial court found individual damages issues would predominate over the common issue of unconscionability. Wilens argues this finding was erroneous because the CLRA imposes statutory damages for a violation. Thus, if the termination without notice provision is unconscionable, all class members would be entitled to statutory damages. This reasoning is flawed.

■   Civil Code section 1780, subdivision (a) allows an action to be brought by a consumer "who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 . . . ." Such a consumer can then recover "[a]ctual damages, but in no case shall the total award of damages in a class action be less than one thousand dollars ($1,000.)" (Civ. Code, § 1780, subd. (a)(1).) This language does not create an automatic award of statutory damages upon proof of an unlawful act. Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof. (*Massachusetts Mutual Life Insurance Company v. Superior Court* (2002) 97 Cal.App.4th 1282, 1292 [119 Cal.Rptr.2d 190].)

---

[1] A determination that the action is meritorious is not necessary to certify a class action. "[T]he question of certification [is] essentially a procedural one that does not ask whether an action is legally or factually meritorious." (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at pp. 439–440.)

Wilens cites *Kagan v. Gibraltar Savings and Loan Assoc.* (1984) 35 Cal.3d 582 [200 Cal.Rptr. 38, 676 P.2d 1060] in support of his assertion that a member of a CLRA class action need not suffer actual damage. But *Kagan* is inapposite. There, the plaintiff brought an action against a bank individually and as a representative of a class, alleging the bank violated the CLRA by falsely representing that customers would not be charged management fees in connection with individual retirement accounts. The plaintiff notified the bank that its alleged violations affected individuals other than herself and she intended to file suit if it did not rectify its violations. Shortly before the plaintiff filed the action, the bank notified the plaintiff it had not deducted the $15 management fee from her account and refunded the fee it had charged her husband. Subsequently, the bank asserted that the action lacked merit because the plaintiff had not suffered any damage as required by Civil Code section 1780. Noting that a prospective defendant should not be able to avert a class action by "picking off" prospective plaintiffs one-by-one, the Supreme Court held the "exemption of the plaintiff from the imposition of the trustee fee does not render her unfit per se to represent the class." (*Kagan v. Gibraltar Savings and Loan Assoc., supra,* 35 Cal.3d at pp. 593, 595.) The bank had been put on notice that the alleged violations affected a class of consumers and it had failed to correct such violations as to all similarly situated consumers.

■ Unlike some class actions, this case does not lend itself to the presumption that each class member suffered damage by the mere insertion of the termination without notice provision in the webBroker agreement. Nor can we presume that those in the subclass, i.e., those whose access was terminated without notice, suffered damage caused by the termination. In CLRA actions alleging fraud on behalf of a class of consumers, causation can sometimes be inferred by the materiality of the misrepresentation. For example, in *Vasquez v. Superior Court* (1971) 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964], a plaintiff brought a fraud action on behalf of consumers who had purchased frozen food and freezers on installment contracts, alleging that the defendants had materially misrepresented the quality and value of the food and freezers the plaintiffs had agreed to purchase. "[I]f the trial court finds material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class." (*Id.* at p. 814.) The same reasoning was used in *Occidental Land, Inc. v. Superior Court* (1976) 18 Cal.3d 355 [134 Cal.Rptr. 388, 556 P.2d 750], where the plaintiffs brought a fraud action on behalf of 155 purchasers of homes in a subdivision, alleging that the defendant developer failed to include substantial costs of maintaining common areas which were ultimately passed on to the homeowners. "Because the purchases made by plaintiffs were acts consistent with their reliance

on the subdivision report, we conclude that the trial court did not err in inferring that justifiable reliance may be established on a common basis." (*Id.* at p. 363.)

Wilens argues that differences in calculating damages are not a proper basis for the denial of class certification. But the individual issues here go beyond mere calculation; they involve each class member's *entitlement* to damages. Each class member would be required to litigate "substantial and numerous factually unique questions to determine his or her individual right to recover," thus making a class action inappropriate. (*Acree v. General Motors Acceptance Corporation* (2001) 92 Cal.App.4th 385, 397 [112 Cal.Rptr.2d 99].)

### Class Certification Under the Unfair Competition Law

Wilens argues the trial court should have certified the class action on his claim that Waterhouse violated the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL), which makes actionable "any unlawful, unfair or fraudulent business act or practice . . . ." He claims the unconscionable provision is unlawful under the CLRA and thus qualifies for action under the UCL.

The propriety of a class action under the UCL is governed by Code of Civil Procedure section 382, which, like Civil Code section 1781, permits a class action only when there are question of law or fact which predominate over questions affecting individual members. (*Massachusetts Mutual Life Insurance Company v. Superior Court, supra,* 97 Cal.App.4th at p. 1287.) Unlike the CLRA, however, the only remedies available are injunctive relief and restitution. (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [96 Cal.Rptr.2d 485, 999 P.2d 718].) Wilens argues Waterhouse should be required to disgorge its illegal profits into a fluid recovery fund under Business and Professions Code section 17535 (allowing the trial court to order injunctive and restitutionary relief).

There is substantial evidence that individual issues would predominate over the common ones under the UCL. Waterhouse did not charge a flat fee for Internet access; rather, it charged its webBroker customers a commission only if they completed their trades. Accordingly, it made no illegal profits from their inability to trade on the Internet. Wilens argues Waterhouse did profit from such an inability because a webBroker customer whose access was terminated without notice was forced to trade either through the Trade Direct system or by contacting a broker in person, both methods that generated a higher commission than an Internet trade. While this may have occurred with some customers, the circumstances do not give rise to an inference that such a result was widespread throughout the class.

*Class Certification for Breach of Contract*

The trial court did not abuse its discretion in denying certification of a nationwide class on the claim for breach of contract. Wilens would have to prove all the elements of a breach of contract action, i.e., a contract, plaintiff's performance, defendant's breach, and damage, on behalf of the class. To do so, he would have to call on individual members to prove their particular damages. (See *Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442 [153 Cal.Rptr. 28, 591 P.2d 51].)

## CONCLUSION

The order denying certification of a class action is affirmed. Respondents shall recover their costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.