Filed 11/19/14; pub. order 12/5/14 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAGMAR HALE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>SHARP HEALTHCARE et al.,<br><br>    Defendants and Respondents. | D064023<br><br><br><br>(Super. Ct. No. 37-2007-00060598-CU-BT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Affirmed.

Law Offices of Barry L. Kramer and Barry L. Kramer; Strange & Carpenter, Brian R. Strange and Gretchen Carpenter for Plaintiff and Appellant.

Higgs, Fletcher & Mack, John Morris and Alexis S. Gutierrez for Defendants and Respondents.

INTRODUCTION

This is Dagmar Hale's second appeal in a class action against Sharp Healthcare and Sharp Grossmont Hospital (together Sharp) contending Sharp unfairly charged her and other uninsured patients more for emergency services than the fees it accepted from patients covered by private insurance or governmental plans. In the first appeal, we partially reversed a judgment of dismissal following a demurrer. The trial court thereafter certified the class. After engaging in discovery, Sharp moved to decertify the class arguing a class action is inappropriate based on lack of ascertainability and lack of predominantly common issues. The trial court considered the evidence presented and found there is no reasonable means to ascertain the members of class without individual inquiries of more than 120,000 patient records and continued class treatment is not appropriate because individualized issues, rather than common issues, predominate, particularly with respect to whether or not class members are entitled to recover damages. Finding no abuse of discretion, we affirm the order decertifying the class.

FACTUAL AND PROCEDURAL BACKGROUND

A

Hale was admitted to Sharp Grossmont Hospital in January 2007 and received "medical treatment, central services, lab work, medication, emergency hospital care and [CT] scans." She was uninsured at the time and signed an admission agreement, which stated, "you hereby individually obligate yourself to pay the account of the hospital in accordance with the regular rates and terms of the hospital." Sharp billed Hale $14,447.65

2

for the services provided.  Sharp offered Hale financial assistance for her emergency room visit and substantially discounted her bill.

B

Hale filed this action challenging "the unreasonable, unconscionable and unlawful charges billed to uninsured persons for medical treatment at Sharp hospitals and healthcare facilities."  She alleges Sharp does not charge uninsured patients "regular rates" but charges "uninsured patient's significantly more for the same services than they charge other (e.g., insured or Medicare-covered) patients."  She alleges Sharp engages "in a pattern and practice of charging unfair, unreasonable and inflated prices for medical care to their uninsured patients, charging them exponentially more than other patients for the very same treatment."

In Hale's first appeal, we reversed in part a judgment of dismissal because we concluded Hale sufficiently stated causes of action under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.).  (*Hale v Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1377.)

C

After remand, the trial court granted Hale's motion for class certification and certified the class with the following definition:  "All individuals who from August 11, 2003 to [December 16, 2011] (a) received emergent-care medical treatment at a Sharp Hospital and signed the defendant Sharp Healthcare standard form Admission Agreement; and (b) were not covered by insurance or government healthcare programs at the time of

3

treatment (the 'Class') . . . ."  The court stated, "[t]he case presents a single common issue that predominates over any single issue, i.e., whether defendant Sharp Healthcare represented to its uninsured patients in its standard form Admission Agreement that it would provide services at defendant Sharp Healthcare 'regular rates', but failed to do so."

Sharp developed a protocol to search its electronic records and identified over 120,000 potential class members who may have had unfunded emergency department visits between August 1, 2003 and December 16, 2011.  However, Sharp advised the court it could not conclusively determine whether a potential uninsured emergency department patient signed an Admission Agreement without reviewing individual records and the potential class members included patients who had all or part of their expenses paid by a third party.

The court ordered notice be disseminated to potential class members by individual mailings and publication.  A third party mailed individual notices to potential class members in May 2012 and provided publication notice.

D

Sharp filed a motion to decertify the class in March 2013, based in part on evidence obtained from putative class members in discovery.  Sharp argued the class is not ascertainable because Sharp does not keep records in such a way to reasonably and readily identify those included in the class definition without individualized inquiries.  Sharp also argued the class action device is not a superior method to litigate this matter because there

4

is no manageable way to prove entitlement to damages on a classwide basis without individual inquiries.[1]

Sharp presented evidence all emergency room patients, whether insured, uninsured or covered by governmental healthcare benefits, are billed at rates listed on a publicly available "charge description master" commonly referred to as a "Chargemaster." It also explained, due to state law prohibiting discussion of financial issues until a patient is stabilized, many times a determination of whether a patient is insured or not does not occur until after a patient is admitted and receives treatment. Additionally, although a patient may be listed as "self-pay" or "uninsured" when they present to the emergency department, the billing department is trained to work with patients to help them determine if coverage might be available through private insurance, government programs or other financial assistance programs. Patients commonly do not believe they are eligible for government benefits and indicate "self-pay" on the intake forms, but later qualify for and receive such benefits.

Sharp does not regularly update the initial revenue code in its electronic records to correct payer status so patients who ultimately receive benefits may still be listed as "self-pay." To determine what a patient paid or to determine if a patient qualified for some form of coverage or assistance, Sharp argued it would be required to conduct individual reviews of each of the more than 120,000 patient records initially identified during the class period.

---

[1] Although Sharp raised other issues in its motion to decertify the class, we limit our discussion to those issues articulated by the trial court in its decertification order.

5

Sharp presented evidence self-pay patients on average pay Sharp less than other payors. Sharp cited 2009 statistics indicating uninsured patients on average paid 4 percent of the Chargemaster rates whereas Medicaid paid 13 percent, Medicare paid 16 percent and private insurance companies paid 56 percent of the Chargemaster rates. Some uninsured patients pay nothing for their visits.

Sharp also presented evidence from a sample of 10 absent class members. Two paid nothing in connection with multiple emergency room visits. Two had their bills paid or reimbursed by third parties. The other absent class members paid less than the full Chargemaster rate for services after obtaining negotiated discounted rates from Sharp ranging from an average of 20 to 90 percent.

Hale opposed the motion arguing the fact all patients are charged the same Chargemaster rates is irrelevant because the issue of differing payment obligations is a matter for the trier of fact as is "the interpretation of Sharp's 'regular rates' or 'reasonable rates'." She argued Sharp's policies "show that there are several different methods of fixing Sharp's 'regular rates' or 'reasonable rates' on a class-wide basis." Hale produced a chart from Sharp outlining self-pay price quotes and discount options, including a charity care adjustment and tiered discounting based on the amount of the bill. She also submitted an excerpt of a policy regarding financial assistance for uninsured or low income patients. Hale argued she would attempt to establish a "reasonable value" for services on a class-wide basis using an expert to testify to an across-the-board reduction of the charged fees, such as 140 percent of Medicare, which is sometimes used by Sharp.

6

Hale also argued the class definition is not overbroad and the class is ascertainable and manageable. Hale conceded "there are undoubtedly some potential class members who were sent notice but who turn out to have suffered no harm or damages (i.e., patients who received fully charity care discounts, whose bills were covered by government or nongovernmental third party payers, who paid little or nothing to the hospital and whose bills have been written-off as bad debt with no adverse consequences)," but argued "this does not present any problem, since those potential class members will not be subject to refunds or injunctive relief."

In reply, Sharp contended the class is not ascertainable or manageable without a case-by-case analysis. Sharp also disputed Hale's proposal to establish liability by setting an across-the-board "reasonable" rate by reducing charged fees by a set percentage, such as to 140 percent of Medicare. Sharp presented evidence Hale did not accurately represent the policies she relied upon and rates of 140 percent of Medicare would not necessarily be reasonable for emergency department patients without insurance even though some government-mandated financial assistance policies and prescheduled and prepaid procedures are set at such a rate.

After a hearing, the trial court granted the motion to decertify the class. The court determined (1) the class is not reasonably ascertainable and (2) there is not a well-defined community of interest in the questions of law and fact involving the affected parties. As to lack of predominance, the court identified a significant problem in determining the right to recover damages on a class-wide basis. The court also noted Hale herself obtained a discount on her bill, which not only illustrated why individual inquiries are necessary but

7

also raised concerns about whether her claim is typical. The court observed, "Perhaps her claim *is* typical, which underscores the points raised above with ascertainability of a class in the first instance."

## E

Hale applied ex parte for an order allowing her to move to amend the class definition before her time to appeal the decertification order expired. The court denied the application finding no new facts or law were cited to reconsider the court's decertification ruling. However, on the merits, the court found "the proposed class definition by plaintiff does not cure the essential problems identified by the Court in ruling on the decertification."

## DISCUSSION

## I

### *Standard of Review for Class Certification Decisions*

A party seeking class certification has the burden of establishing the prerequisites to certification and " 'more than "a reasonable possibility" that class action treatment is appropriate.' " (*Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 7.) " 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' " (*Sav-on Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326.)

Even when a class is certified, the court has continuing power and discretion to reexamine the propriety of class certification. (Cal. Rules of Court, rule 3.764(a)(3)-(4); *Weinstat v. Dentsply International, Inc.* (2010) 180 Cal.App.4th 1213, 1226.) Should new

8

facts be developed, "the trial court has the flexibility to . . . decertify the class altogether." (*Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1294, fn. 5.)

As a result, we will reverse a trial court certification ruling "only if a ' "manifest abuse of discretion" ' is present. [Citation.] ' "A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]" [Citations.]' [Citation.] [¶] 'We must "[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . ." ' " (*Thompson v. Automobile Club of Southern California* (2013) 217 Cal.App.4th 719, 725-726 (*Thompson*), quoting *Brinker Restaurant Corp v. Superior Court* (2012) 53 Cal.4th 1004, 1022.)

"We review the trial court's actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530 (*Ayala*).) However, "[a]ny valid, pertinent reason will be sufficient to uphold the trial court's order." (*Thompson*, *supra*, 217 Cal.App.4th at p. 726.)

## II

### *Class Certification*

" 'The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the

alternatives. [Citations.]  "In turn, the 'community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' " ' "  (*Ayala*, *supra*, 59 Cal.4th at pp. 529-530.)

The court in this case decertified the class finding (1) the class itself is not reasonably ascertainable without an individualized or file-by-file analysis and (2) there is no well-defined community of interest because diverse individual issues predominate regarding the entitlement to or the fact of damages.  As we shall explain, we find no abuse of discretion.

A

*Lack of Ascertainability*

"Whether a class is ascertainable is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying class members."  (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1271.)  " ' " 'Class members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records.' " ' "  (*Thompson*, *supra*, 217 Cal.App.4th at p. 728.)  "Class certification is properly denied for lack of ascertainability when the proposed definition is overbroad and the plaintiff offers no means by which only those class members who have claims can be identified from those who should not be included in the class."  (*Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 7.)

10

In this case, the court noted the class definition here—"those who received 'emergent-care' after August 11, 2003 and who 'were not covered by insurance or government healthcare programs at the time of treatment' "—is clear enough on the surface. "Either a party has insurance or does not." However, the court found the class definition is not so clear when considering Sharp's evidence "that a determination of who is uninsured does not necessarily occur until after the patient receives treatment and could in fact change throughout treatment" and parties "often change their payer status during the course of treatment." The court concluded the "class definition of 'uninsured at the time of treatment' thus appears to be over-inclusive by including patients who may obtain insurance at some point in time after they present but before they pay a bill. The definition could be under-inclusive to the extent that it excludes patients who, for whatever reason, lose insurance after they present as insured."

Hale argues the court's ruling "makes no sense" because, according to Hale, the "only relevant question is whether the patient has insurance *at the time they present themselves at Sharp's emergency room*." (Emphasis in original.) She then contends "whether Sharp's records at the time of admission are entirely accurate, or its determination as to who is responsible and billed for services is made days or weeks after treatment is rendered, makes no difference whatsoever" because "[t]he question is simply whether bills are paid by Medicare, Medicaid, an insurer or solely by the patient."

It is Hale's later formulation of the question that presents the problem. Hale's focus on an oversimplified class definition fails to consider the second prong of ascertainability, which requires class members to be readily identifiable without unreasonable time and

11

expense. The concern about the overbreadth of the class has to do not with patients who later obtain insurance that is "not retroactive" as Hale argues, but with patients who are later determined to qualify for coverage in some form for the emergency visit at issue. It is the inability to reasonably discern those individuals from individuals who were actually uninsured and then to identify any disparity in amounts paid that makes it unreasonable to ascertain the defined class.

Here, Sharp presented evidence showing there is no reasonable way for Sharp to ascertain who has claims and who does not without an individualized analysis of each patient's payment record. Sharp's director and vice president of patient financial services declared Sharp often does not determine whether a patient is insured or not until after the patient is admitted and receives treatment because state law prohibits discussion of financial issues until a patient is stabilized, which may occur minutes or days after admission. Sharp's billing department is trained to work with patients and many who initially come into the emergency room representing themselves as "uninsured" later are determined to be entitled to coverage through private insurance, government programs or are otherwise eligible for financial assistance. "It is common for patients to think they are not eligible for government health benefits at the time they present for treatment, and have the in-take records indicate self-pay, only to later qualify for such a program and receive benefits." Additionally, patients may qualify for partial or full charity financial assistance based on the level of the patient's income.

However, Sharp does not regularly update its patient records to correct the initial payer status code. As a result, a computer program searching for a "self-pay" code necessarily includes patients who applied for and received benefits from another source, resulting in an overbroad class. Sharp does not maintain patient information in a manner that permits access to payment status on an aggregated basis. Instead, "Sharp would have to conduct an individual inquiry into each of the 122,000+ [patient] records" to determine what a patient paid for an encounter, if the patient qualified for government assistance, if the patient was offered a charity discount and what payments were made, if any, Sharp incurred considerable time and expense to write a program to attempt to initially identify "unfunded" patients seen in Sharp emergency departments during the class period to give notice to the defined class. However, the results were over inclusive and it would take significant additional time and expense to make individual inquiries and construct a new database of patient information based on the services rendered to the patients, discounts offered and the status of collection efforts.[2]

---

[2] The trial court did not consider the late-filed declaration of Hale's attorney Barry Kramer. We similarly decline to consider the portions of Hale's reply brief based on this declaration asserting her attorney was able to "filter" data provided by Sharp in an Excel spreadsheet to eliminate non-class patients who made no payments and had no account balances. Even if we were to consider the argument, it is not persuasive. The Excel spreadsheet was created from individual inquiries of billing information from only a sample of 900 patients out of more than 120,000 potential class members. Manipulation of this spreadsheet does dispose of the need to conduct individual reviews of the billing data for the remaining class members.

After considering the evidence, the court stated, "Sharp persuasively argues that it does not maintain patient information in a manner that easily permits access to data points like whether the patient was finally determined to be self-pay on [an] aggregated basis. . . . An individual inquiry into each of the 122,000+ patients is required. . . . As indicated in the motion and declarations . . . Sharp was required to create a computer program to attempt to isolate unfunded patients that fit the class definition. Sharp contends that the computer program has been unsuccessful in that the results are over-inclusive. There is no requirement that Sharp maintain this data at least in aggregate form and the Court does not impose such requirement. [Citation.] Where the administrative cost in identification and processing of past general relief recipients' claims is so substantial to render the likely appreciable benefits to the class de minimis in comparison, the class action should not be certified."

The trial court exercised its discretion to decertify the class after concluding the class is not reasonably ascertainable. We find no abuse of discretion.

B

*Lack of Predominance of Common Issues*

Hale argues the trial court applied the wrong standard to determine the class lacked predominantly common issues and improperly focused on individual issues regarding "damages" when it decertified the class. We are not persuaded.

" 'A class may be certified when common questions of law and fact predominate over individualized questions.' " (*Ali v. U.S.A. Cab Ltd.* (2009) 176 CalApp.4th 1333, 1347 (*Ali*).) The " 'ultimate question for predominance is whether 'the issues which may be

14

jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] 'The answer hinges on "whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment." ' " (*Duran v. U.S. Bank National Assoc.* (2014) 59 Cal.4th 1, 28 (*Duran*).)

Hale relies on wage and hour cases in which courts have held individualized issues regarding proof of the amount of damages class members may recover does not defeat class action so long as there are common questions of liability amenable to class resolution. (E.g. *Bluford v. Safeway Inc.* (2013) 216 Cal.App.4th 864, 870-871 [common issue regarding liability was based on policies and procedures applied uniformly to all class members so individual damage issues did not defeat class certification]; *Falkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 232-240 [common issues of fact predominated for subclasses related to meal, rest and overtime violations because liability could be determined classwide based on uniform policies, or lack thereof; individual issues, such as whether individuals took rest breaks, went to the issue of damages and did not preclude class certification]; *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986, 997 [a uniform policy denying compensation for preshift work presented predominantly common issues of fact and law because liability depended on the existence of the uniform policy, rather than individual damages determinations]; *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 726 [theory that defendant violated wage and hour requirements by failing to adopt meal and rest break policies is amenable to

15

class treatment; whether employee was able to take required breaks goes to damages]; *Bradley v. Networkers International, LLC* (2012) 211 Cal.App.4th 1129, 1150-1153 [class certification proper where plaintiff's theory that employer's uniform policy violated labor laws regarding meal and rest breaks can be determined by common facts; individual proof of damages does not bar certification].)  The common theme in these cases is that plaintiff's theory of liability could be determined based on common uniform policies applicable to the class as a whole.

Recently in *Hall v. Rite Aid Corp.* (2014) 226 Cal.App.4th 278 we determined the trial court erred in basing its decertification order on an assessment of the merits of the claim rather than on whether the theory of liability was amenable to class treatment.  Citing the foregoing cases, we noted Rite Aid had a uniform policy of not allowing its cashiers to sit while they performed checkout functions at a register, which allegedly violated California law and this theory of recovery was amenable to common proof.  (*Id.* at pp. 292-293.)  We concluded "as long as the plaintiff's posited theory of liability is *amenable* to resolution on a classwide basis, the court should certify the action for class treatment *even if* the plaintiff's theory is ultimately incorrect at its substantive level, because such an approach relieves the defendant of the jeopardy of serial class actions and, once the defendant demonstrates the posited theory is substantively flawed, the defendant 'obtain[s] the preclusive benefits of such victories against an entire class and not just a named plaintiff.' "  (*Id*. at pp. 293-294, quoting *Brinker*, *supra*, 53 Cal.4th at pp. 1033, 1034, italics in original.)

16

The problem identified by the court regarding Hale's action here does not involve individual issues regarding calculation of the *amount* of damages a class member may recover once liability is established, but determination of the *fact* of damage. In other words, whether there is any common proof to establish entitlement to or, as the trial court put it, the "right to recover" damages.

The trial court found the facts presented here to be similar to those in *Ali*, *supra*, 176 Cal.App.4th 1333. In that case the court determined "common questions pertaining to the *fact* of damage" did not predominate. (*Id*. at p. 1349.) The *Ali* court anticipated a trial of a class action involving whether a cab company failed to provide workers' compensation coverage and to pay minimum wages would involve " 'a parade of drivers' presenting individual issues" such as whether the drivers suffered on-the-job injuries and whether they earned net income equaling or exceeding minimum wage. "Although the leases and training manuals are uniform, the court reasonably found the testimony of putative class members would be required on . . . the fact of damage." (*Id*. at pp. 1349-1350.)

Similarly here, the declarations and deposition testimony of a sampling of putative class members showed some patients did not pay anything for their care, some had their bills paid or reimbursed by third parties and others obtained negotiated rates. Based on this evidence, the court stated: "[a]ll of this means that each individual will have to litigate numerous and substantial issues to determine the *right to recover* in this case: issues such as whether a third party ultimately paid for the bill, the amount of the negotiation of the bill by Sharp, the discounted rate and the calculation for that rate, etc." (Italics added.) Quoting *J.P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 216, the

17

court concluded, "[i]f plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable. If classwide proof of illegality and impact is not possible, the class must be decertified.' In this case, the class would be impacted differently depending on factors unique to the individual."

Therefore, the court concluded a trier of fact could not get to the issue of whether any of the class members are entitled to damages, without undertaking individualized inquiries of more than 120,000 patient accounts. This finding was supported by substantial evidence presented by Sharp. We find no abuse of discretion.

This analysis is consistent with recent class action authorities. In *Duran*, *supra*, the Supreme Court reversed a judgment based on a trial court's use of a random sample to extrapolate liability to all class members alleging they were misclassified as exempt employees and therefore were deprived of overtime payments. The court concluded the sampling in that case prevented the defendant from showing some class members were not entitled to recovery. (*Duran*, *supra*, 59 Cal.4th at pp. 12-13.) Discussing predominance, the Supreme Court stated, " ' "[a]s a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages." ' " (*Id.* at p. 28.) However, the court cautioned "class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual *right to recover* following the "class judgment" ' on common issues." (*Duran*, *supra*, 59

18

Cal.4th at p. 28, italics added.)  " 'Only in an extraordinary situation would a class action be justified where, subsequent to the class judgment, the members would be required to individually prove not only damages, but also liability.' "  (*Id.* at p. 30.)  In rejecting the sampling technique used by the trial court in that case to prove liability, the *Duran* court reiterated " '[u]ncertainty of the *fact* whether any damages were sustained is fatal to recovery, but uncertainty as to the *amount* is not.' "  (*Id.* at p. 40.)

In *Thompson v. Automobile Club of Southern California*, *supra*, 217 Cal.App.4th 719, Division Three of the Fourth Appellate District affirmed an order denying class certification in a case alleging the defendant's auto club renewal policies resulted in late-renewing members receiving less than a full year of services.  The court determined common issues did not predominate because individualized issues existed regarding whether damage recovery was possible, not merely the measure of damages.  These individual issues included what benefits, if any, were received during the delinquency period, whether the renewal practices saved class members money rather than paying a new member fee and whether the member was aware of the renewal policy.  (*Id.* at pp. 731-732.)  The court noted these issues were essentially the same issues identified as to why the class was not ascertainable, but they were equally important for a predominance analysis.  (*Id.* at p. 731.)

In *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341 the court denied class certification in a case alleging the company required employees to purchase company clothing to wear to work but failed to reimburse such purchases.  Because there were no clear company-wide policies requiring employees to purchase company clothing as a

19

condition of employment or describing what an employee was required to wear, the trial court determined there was no common method to prove the fact of liability on a class-wide basis. Rather, individualized inquiries would need to be made regarding what employees were told by store managers about wardrobe, how employees interpreted any such discussion, whether attire required by the company constituted a uniform, where employees purchased wardrobe items and the particular items purchased. (*Id.* at pp. 1356-1357.) The Court of Appeal affirmed concluding the plaintiffs did not meet their burden to present an effective plan to manage the individual issues necessary to determine the fact of liability, i.e. the right to recover, on a class-wide basis. (*Id.* at pp. 1368-1369; see *Wilens v. TD Waterhouse Group, Inc.* (2003) 120 Cal.App.4th 746, 756 [individual issues went beyond calculation of damage and involved "each class member's *entitlement* to damages. Each class member would be required to litigate 'substantial and numerous factually unique questions to determine his or her individual right to recover,' thus making a class action inappropriate"]; *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 459 ["a class action cannot be maintained where each member's right to recover depends on facts peculiar to his case"].)[3]

---

[3] Courts must also consider manageability of individual issues when determining whether or not to certify a class. (*Duran*, *supra*, 59 Cal.4th at pp. 28-29.) "Trial courts must pay careful attention to manageability when deciding whether to certify a class action. In considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class. . . . [¶] Trial courts also have an obligation to decertify a class action if individual issues prove unmanageable." (*Id.* at p. 29.) Similarly in *Ayala*, *supra*, 59 Cal.4th at page 539 the Supreme Court explained, "[o]nce common and individual factors have been identified, the predominance inquiry calls for weighing costs

Hale attempts to overcome the problem of establishing a right to recover on a classwide basis by arguing liability may be determined by calculating "the reasonable value of Sharp's services" on a classwide basis "for example, as a fixed percentage of the Chargemaster rates." Then, based on that formula, analyze what, if any damages class members are entitled to if they were charged more than that fixed percentage. Hale contends these calculations "can literally be performed at the press of a computer key."

We are not persuaded. Even though Sharp's patient billing data is contained in an electronic system, Sharp presented evidence there is no easy way to calculate either "reasonable rates" or what amount, if any, uninsured patients paid beyond such a rate based on a simple "press of a computer key."

According to Sharp, to determine the reasonableness of the Chargemaster rates, one must analyze over 7,000 line items for individual and bundled procedures, services, and goods derived for each individual patient. In addition, reimbursement rates from private insurance companies are based on "a myriad of schedules that use per diem rates and/or case rates, and at times different service reimbursement methodologies within the same plan. . . . Reimbursement rates are patient-specific, contract-specific, and plan-specific." There are variances in reimbursement rates based on deductibles, co-payments, caps, etc. Finally, reimbursement rates are influenced by factors such as whether a procedure was

and benefits. . . . 'Individual issues do not render class certification inappropriate so long as such issues may effectively be managed.' " Although not articulated as a separate reason for decertification, the trial court's findings also imply continuation of this class action would be unmanageable based on the numerous individual issues that would have to be tried to establish entitlement to damage.

21

performed on an inpatient or outpatient basis, physician's orders, medical necessity and specialty services or procedures.

Sharp estimated it would require construction of additional databases and tens of thousands of hours to individually review the patient notes sections of each patients' electronic file to (1) determine what, if any, reimbursements were made for more than 120,000 unfunded patients (i.e. class members), what discounts were offered to these patients and the status of collection efforts and (2) to compare the rates paid by unfunded patients versus those paid by privately insured, Medicare, and Medi-Cal patients. The fact that one possibly could "filter" or manipulate data ultimately produced from such individualized searches does not assist Hale.

We are also not persuaded by Hale's proposal to fix a reasonable rate based on an arbitrary percentage of the Chargemaster rates. The Supreme Court in *Duran* rejected a proposal for shortcutting the determination of liability based on statistical analysis stating, "no court has 'deemed a mere proposal for statistical sampling to be an adequate evidentiary *substitute* for demonstrating the requisite commonality or suggested that statistical sampling may be used to manufacture predominant common issues where the factual record indicates none exist.' " (*Duran*, *supra*, 59 Cal.4th at p. 31.) Although the Supreme Court has encouraged courts to be " 'procedurally innovative' in managing class actions" (*Id*. at p. 33), the court cautioned "[p]rocedural innovation must conform to the substantive rights of the parties," including the right for the defendant to litigate its affirmative defenses. (*Id*. at p. 40.) The same concern applies here. Hale's proposal to submit an expert to testify to an across-the-board reduction in fees based on a percentage of

22

the Chargemaster rate or even some statistical sampling is not an adequate evidentiary substitute for establishing commonality or entitlement to damages and such a method would deny Sharp the ability to defend.

Hale's citation in her reply brief to *Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260 (*Children's Hospital*) does not assist her. The dispute in that case involved the reasonable value of poststabilization emergency medical services provided to Medi-Cal beneficiaries enrolled with Blue Cross during a time when the Blue Cross contract with the hospital had lapsed. Blue Cross paid Medi-Cal rates, but the hospital demanded its full billed charges. (*Id.* at pp. 1264-1265.) The hospital argued the court could not consider Medi-Cal or Medicare rates accepted by the hospital or "service specific costs" to determine reasonable rates. (*Id.* at p. 1265.) The Court of Appeal held the reasonable value or market value of the services is not ascertainable from the full billed charges alone. Although the billed charges are relevant to the issue of reasonableness, the jury should consider the range of payments paid to and accepted by the hospital, including amounts paid by the government. (*Id.* at p. 1275.) In this case, Sharp does not argue rates it accepts from governmental programs or private insurance are irrelevant. Instead, Sharp presented evidence the analysis required to make this comparison in this case and then to determine any right to recover is unreasonable and unmanageable in a class setting because of the individual analysis required.

Therefore, we cannot conclude the trial court abused its discretion in decertifying the class based on a lack of predominantly common issues regarding the right to recover.

## III

### *Motion to Amend Complaint*

Hale contends the trial court abused its discretion in denying her application to hear a motion to amend her class definition. We disagree and again find no abuse of discretion.

After the trial court decertified the class, Hale proposed amending the class definition by inserting a clause stating: "Excluded from the Class are individual hospital visits for which Sharp's electronic data records show (1) no patient payments and no current account balance, and/or (2) one or more payments for the visit from other than the patient."

In supplemental briefing, Hale proposed redefining the class to eliminate reference to insurance or governmental healthcare programs at the time of treatment as follows: "All individuals who, from August 11, 2003 to December 16, 2011, had one or more 'eligible patient hospital visits' to a Sharp Hospital Emergency Department. [¶] For purposes of this class definition, an 'eligible patient hospital visit' is defined as a hospital visit to a Sharp emergency department for which Sharp's billing records show (1) one or more patient payments have been made, and/or an account balance currently exists; and (2) no payments for the hospital visit have been made by other than the patient . . . ."

Hale contends such amendment would eliminate any problems with ascertainability or commonality. The trial court, after noting the motion for leave to amend appeared to be little more than a motion to reconsider the motion to decertify the class without new facts or law, concluded the proposed redefined class would not cure the essential problems identified in the decertification order. We agree with the trial court.

24

It sounds simple enough to eliminate from the class those patients whose billing records show they no longer have an account balance and those who had payments made on their behalf by an entity or person "other than the patient." However, the proposed redefined class does not address how Sharp is to identify those patients without conducting the individualized inquiries of each patient's billing records, as Sharp indicated it must do. Hale's suggestion of applying "filters" to the spreadsheet produced from Sharp's first sampling attempt does not deal with the underlying problem of gathering the data from the individual patient billing files at the outset. Sharp established it does not maintain patient billing records in such a way that it is able to conduct aggregated searches of the data in the way Hale proposes. As the trial court concluded, Sharp is not required to maintain records in such a way and it would be unreasonable and unmanageable to conduct the necessary individualized analysis necessary to identify the class members and litigate this matter as a class action.

## DISPOSITION

The order is affirmed. Sharp shall recover its costs on appeal.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

IRION, J.

25

CERTIFIED FOR PUBLICATION

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

DAGMAR HALE,
Plaintiff and Appellant,
v.
SHARP HEALTHCARE,
Defendant and Respondent.
**D064023**
**San Diego County No. 37-2007-00060598-CU-BT-CTL**

THE COURT:

      The opinion in this case filed November 19, 2014 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c) the non-party's request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

      IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

      ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

                       ____MCCONNELL_____
                       Presiding Justice

cc: All Parties