Filed 10/18/17; Certified for Publication 10/23/17 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PAUL KENDALL, | D070390 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00073680-CU-BT-CTL) |
| SCRIPPS HEALTH, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of San Diego County, Richard E. L. Strauss, Judge. Affirmed.

Carpenter Law, Gretchen A. Carpenter; Law Office of Barry Kramer and Barry L. Kramer for Plaintiff and Appellant.

Hooper, Lundy & Bookman, Jennifer A. Hansen and Sansan Lin for Defendant and Respondent.

Plaintiff and appellant Paul Kendall's second amended complaint asserts several types of class-wide claims that challenge the billing and collection practices of the health facility operating an emergency room where he received care, defendant and respondent

Scripps Health (Scripps). As relevant here, Kendall seeks declaratory relief on contract interpretation theories, and remedies under the Consumers Legal Remedies Act (CLRA; Civ. Code, § 1750 et seq.) and the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.; both are sometimes designated the statutory claims). Under the latter theories, Kendall seeks injunctive relief and damages or restitution of amounts charged to emergency care patients, such as himself, who do not have insurance or similar governmental benefits such as Medicare or Medi-Cal. Kendall contends that such "self-pay" patients, who signed a form during the reception process at the emergency room (an "Agreement for Services at a Scripps Facility," hereafter Agreement for Services), are being unfairly billed under that contractual agreement at prescribed rates that are listed on a publicly available "charge description master" (Charge Master). Such Charge Master rates are alleged to be higher than the reimbursement amounts that such hospitals customarily receive from the insurers for patients who have policy coverage, or from medical governmental benefits providers. Kendall objects that self-pay patients such as himself are harmed when they receive medical bills reflecting Charge Master rates.[1]

This appeal arises from the trial court's order denying Kendall's motion to certify a proposed class of self-pay patients for the pursuit of two overriding legal theories that

---

[1]     As a licensed hospital, Scripps is required to comply with the provisions of Health and Safety Code section 127400 et seq., the Hospital Fair Pricing Policies Act, on notifications to patients of available discounts and charity care options. (Health & Saf. Code, §§ 127401, 127410; all further statutory references are to the Health & Saf. Code unless noted.) This Act's provisions are to be construed as allowing hospitals to communicate their otherwise established uniform Charge Master or published rates, when such notifications are implemented. (§ 127444.)

apply to both the declaratory relief and statutory claims. (Code Civ. Proc., §§ 382, 1060, 1061; Civ. Code, § 1781.) These two theories request class-wide contractual interpretation of the payment terms of the Agreement for Services, to limit Scripps to billing or charging such patients no more than the reasonable value of the services rendered, and/or to establish that the listed Charge Master rates are unconscionable as a matter of law. In support, Kendall provided declarations from expert witnesses giving their opinions about usage of typical hospital billing systems and the feasibility of identifying potential self-pay class members.[2]

Scripps opposed the motion, arguing a class action was not shown to be an appropriate method to pursue the case because of a lack of predominant common issues and of any convincing showing of an ability to ascertain the identity of all the proposed class members. Scripps provided declarations from expert witnesses and its financial services manager that described the variability and complexity of its billing arrangements for individualized patient care, in light of applicable government regulations on availability of and reimbursement for emergency hospital care. (E.g., § 1317, subd. (d) [restricting emergency care providers from requiring payment arrangements from a patient until the emergency condition is stabilized, but requiring the patient to agree in writing to supply financial information to the providers after services are rendered].)

The trial court denied the motion for class certification, concluding that Kendall had not presented any substantial evidence showing there were predominant common

---

[2] As to Kendall's individual theories of intentional and negligent concealment that challenge the same Scripps billing activity, no class treatment is sought.

issues of law and fact among the putative class members. The court next addressed the concerns Scripps raised about the difficulty of ascertaining class membership for individual patients' payment records, in terms of recent authority from this court, *Hale v. Sharp HealthCare* (2014) 232 Cal.App.4th 50 (*Hale II*). The trial court concluded Kendall had not shown there were objectively feasible ways of identifying members of the proposed class. The court ruled that the proposed declaratory relief on contract interpretation issues was unsuitable for class-wide treatment, because no actual controversy about the terms of the Agreement for Services was presented, and any such relief would be cumulative to the underlying determinations requested on the statutory claims. (Code Civ. Proc., § 1061.)

On appeal, Kendall contends the trial court's order denying class certification of his statutory claims reflects the use of improper criteria and an incorrect legal analysis. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022 (*Brinker*).) To the extent the court found there were no predominantly common questions existing and that no reasonably ascertainable class had been defined, Kendall argues there was no substantial evidence to support the order. (*Nicodemus v. St. Francis Memorial Hospital* (2016) 3 Cal.App.5th 1200, 1211 (*Nicodemus*).) He further claims the trial court erred in applying California analytical standards to evaluate the propriety of permitting his declaratory relief claim to proceed as a class action, because he believes federal standards developed for dealing with illegal system-wide practices or policies would be preferable. (Fed. Rules of Civ. Proc., rule 23(b) (FRCP); see, e.g., *Briseno v. ConAgra Foods, Inc.*

4

(9th Cir. 2017) 844 F.3d 1121, 1124-1125 [wide variations exist in judicial interpretations of "ascertainability"].)

We conclude the trial court correctly determined that class treatment is not appropriate for any of the identified causes of action. The court analyzed the proposed class definition in terms of well-established class action criteria that require commonality of interests and ascertainability. The court's ruling did not exceed the scope of a proper class determination or impermissibly resolve the merits of the ultimate issues presented. (*Hall v. Rite Aid Corporation* (2014) 226 Cal.App.4th 278, 292 (*Hall*) [" 'for purposes of certification, the proper inquiry is "whether the theory of recovery advanced by the plaintiff is likely to prove amenable to class treatment." ' "].) Finding no abuse of discretion or lack of substantial evidence, we affirm the order denying class certification.

FACTUAL AND PROCEDURAL BACKGROUND

A. Emergency Treatment Provided; Action Filed

Scripps is a nonprofit, integrated health system owning and operating several local hospitals that have emergency rooms. On July 9, 2013, Kendall received emergency treatment at one of these health facilities. At reception, he signed Scripps's Agreement for Services containing numerous provisions, particularly the following "Financial Arrangements" paragraph:

> "If signing as the patient or legal representative, I agree, in consideration for services received, *to pay the Facility's billed charges as contained in the Facility's Charge Description Master* and, if the account is referred to a collection agency or attorney, reasonable attorneys' fees and collection expenses. I authorize the Facility, a collection agency or other entity contracting with the Facility, to obtain my credit report from consumer reporting

5

agencies for use in obtaining payment for services or determining eligibility under the Facility's financial assistance programs. Call 1-800-690-9070 for more information regarding financial assistance." (Italics added.)[3]

Kendall paid a $100 deposit and received treatment, then left the hospital. He was not covered by any commercial medical insurance plan or governmental health program for his treatment, and no payments have been made for his visit by outside sources.[4] Over the next few months, Scripps billed him at Charge Master rates for the services provided in the amount of $17,511, less his deposit. The bills showed coverage determinations were pending and he was otherwise a self-pay patient. The bills sent in October and November 2013 notified him the matter would be sent to collections if no payments were made.

After Kendall filed this action in October 2013, Scripps brought demurrers that were sustained in part. Kendall's operative pleading is the second amended complaint (the complaint), which asserts his statutory claims as potential class action causes of action (CLRA and UCL) and pleads declaratory relief theories. He begins with general allegations that within the hospital industry, hospitals maintain spreadsheets called

---

3    For purposes of this action, Kendall defines patients as including signers of the Agreement for Services, or alternatively, a patient's legal guardian who signed and was billed on the patient's behalf.

4    "A hospital with an emergency department must provide a patient with 'an appropriate medical screening examination' and 'such treatment as may be required to stabilize' any emergency medical condition without regard to the patient's insurance or ability to pay. [Citations.] Further, a hospital generally may not transfer or discharge a patient until it has been determined that the emergency medical condition has been stabilized." (*Children's Hospital Central California v. Blue Cross of California* (2014) 226 Cal.App.4th 1260, 1266 (*Children's Hospital*).)

"Charge Masters," which contain code numbers, descriptions, and gross billing charges for each product and service offered to patients. He contends "these gross billing charges are neither regular payment rates, nor usual and customary payment rates, nor reasonable payment rates. [Scripps's] Charge Masters do not constitute a pricing schedule which any category of hospital patient is expected to pay." He contends the Charge Master rates are not published on the Scripps website, but are made available for review at its offices by appointment during normal business hours. He alleges those Charge Master rates "are several times its internal costs for providing treatment/services. Indeed, according to the most recent annual statistics filed with the California Office of Statewide Health Planning and Development, the Cost-to-Charge ratios (i.e., the overall cost of providing treatment/services compared to the overall [Charge Master] rates for such treatment/services) for [Scripps's] Hospitals ranged from approximately 0.192 to 0.253, which indicates that [Scripps's Charge Master] rates were approximately four to five times its actual costs of providing services."[5]

Kendall seeks injunctive relief from such allegedly illegal billing behavior, as well as damages and restitution, based on CLRA and UCL provisions. As suggested declaratory relief, he requests that the trial court apply a flat percentage reduction from

[5] The Office of Statewide Health Planning and Development (OSHPD) is a California state agency which administers health policy and planning efforts. (§§ 127000 et seq., 127125 et seq.) Among other things, OSHPD requires hospitals to post in emergency rooms information about how its charge description master is made available to patients on hospital websites or at their locations. (§ 1339.51, subds. (a)(1), (c).) Hospitals are required yearly to submit their charges to the OSHPD, pursuant to section 1339.55, subdivision (a). OSHPD publishes selected hospital charge data publicly on its website. (§§ 1339.55, subd. (b), 1339.56, 1339.58.)

the gross billed Charge Master charges, as a means of arriving at the reasonable value of the services rendered.  This reduction would be grounded in a comparison of Charge Master rates and the hospital's costs in providing services, and of the reimbursement rates for various categories of patients covered by other benefits plans.

The parties engaged in discovery.  In interrogatory responses, Scripps estimated that for the type of treatment Kendall received, Medicare would have paid $1,842.69, while Medi-Cal would have paid $2,101.32, according to their government rate schedules.  The court did not require Scripps to estimate what reimbursements could have been received under sample insurance arrangements, as Kendall had requested.

Notably, Kendall took the deposition of the "Person Most Knowledgeable" about Scripps's billing activity, Daniel Kehl, its director of patient financial services.

### B.  Motion for Class Certification and Opposition

In his motion for certification, Kendall proposed the following definition of the class:

> "All individuals (or their guardians or representatives) who, from November 1, 2009 to the date of class certification:  (a) received emergency screening, stabilization, and treatment/services at one of Defendant's emergency care facilities in California; (b) did not have payments for such care made by an insurer or government health care program; and (c) were billed at the Hospital's full [Charge Master] rates (the 'Class').  [¶] Excluded from the Class are those patients who paid nothing on their account, whose balances have been permanently written off in full, and who are not subject to any current or future collection activity or negative credit reporting.  [¶]

8

Also excluded from the Class are [officers of Defendants and judicial officers assigned to this matter, etc.]."[6]

Kendall contended the motion was authorized by California law, including CLRA provisions and "the equivalents of Rule 23(b)(1) and/or (b)(2) of the Federal Rules of Civil Procedure." He requested another hearing for the court to decide on discretionary notice to class members. He argued the predominance requirement was met for determining whether all class members should be required under the contract and applicable law to pay Charge Master rates, as opposed to the reasonable value of the services provided, as he was contending.

As support for the certification request, Kendall supplied a declaration from a consultant specializing in health care financing and operations, Nathan S. Basseen, who has expertise in analyzing the reasonable value of health care services. Basseen reviewed Scripps's filings with the OSHPD, as well as information provided by the Centers for Medicare and Medicaid Services (CMS), a federal agency which supplies provider-specific data for public use. Basseen reviewed deposition testimony from Kehl, Scripps's director of patient financial services. Among other opinions, Basseen drew preliminary conclusions that the Charge Master rates exceeded the costs of providing emergency care

---

6    In the *Hale II* case and its predecessor, the language of the hospital's admissions contract referred to payment at "regular rates." (*Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1378 (*Hale I*); *Hale II*, *supra*, 232 Cal.App.4th at pp. 53-55.) Hale had contended the Charge Master rates billed to uninsured patients were unreasonable and unconscionable, because insured patients were effectively charged less, at insurance or Medicare rates. (*Id.* at p. 54.) By comparison, Kendall attacks the Agreement for Services and its reference to paying the hospital's "billed charges as contained in the Facility's Charge Description Master and, if the account is referred to a collection agency or attorney, reasonable attorneys' fees and collection expenses."

9

services, and also exceeded reimbursement levels from governmental benefits or commercial payers. He believed additional discovery was needed.

Kendall also supplied a declaration from Gerald O'Connell, an expert consultant in health care data management, who evaluated the resources needed to extract and process paid claims data available to Scripps for its emergency room services provided. He described his review of deposition testimony from Scripps's director of patient financial services, Kehl, about its Eclipsys patient accounting software system. O'Connell described common protocols in such accounting systems, concluding that about 10-12 hours of work would be required for a Scripps manager to produce and format the requested data, by utilizing the "report writer" function that Kehl had mentioned at his deposition.

Scripps opposed the motion and filed objections to Kendall's expert declarations, for lack of foundation and other grounds. Scripps argued the proposed class was not reasonably ascertainable, and Kendall had not shown the requisite common issues of law and fact. Scripps submitted a declaration from Kehl, explaining his views on how Kendall's expert witnesses had misinterpreted his deposition testimony about the capabilities of the Eclipsys accounting software, which he said was not able to capture all the individual claims detail that was maintained in Scripps's other main recordkeeping system, "File CD," which deals with imaging hard copy documents. Contrary to what Kendall was claiming, Scripps could not run queries on a single system to identify class members and establish their entitlement to recovery. The "report writer" function Kehl had described at his deposition required exact information about the field of inquiry and

10

the electronic pathway needed to get to such fields, and he had testified such detailed data were not always attainable. Extensive manual review of other systems (e.g., File CD) would be necessary to get the desired information with respect to over one million emergency department encounters during the time periods at issue (not including trauma patients).

Kehl's declaration also stated that Scripps reports financial information to OSHPD, including revenue it receives from various payer groups, but those reports do not show the variations in the amounts billed to patients or received in any particular payer class. Kehl said that instead, "the amount Scripps is paid is influenced by a variety of internal and external factors, including but not limited to the contractual health plan rates [from insurers], fixed governmental rates, individually negotiated package pricing, prompt payment discounts, and the ability of patients to pay their bills, etc. [¶] The revenue received for any particular payer class could also be influenced by whether a procedure was performed on an inpatient or outpatient basis, physicians' orders, comorbidities and complications, medical necessity and specialty services and procedures."

Scripps submitted additional declarations from Tzvi Hefter, an expert health policy consultant, and Michael Heil, a management consultant in the health care field, describing different cost centers within the hospital system, and explaining the levels to which hospital costs during the provision of care sometimes exceed the reimbursement amounts received from government or insurance benefit systems.

In reply, Kendall contended he had set forth an adequate methodology to calculate the estimated reasonable value of emergency services received, on an aggregate basis

11

based on data Scripps could provide about its payments received from patients' benefits or insurance providers.  He proposed unspecified amendments to the class definition.  On appeal, Kendall clarifies that the class membership could now include only those self-pay patients who were directly billed by the hospital at Charge Master rates, for emergency services they received during the defined period of time.

## C.  Ruling

After a reported hearing, the trial court denied the motion to certify the class.  The court first addressed the issue of whether the proposed class was ascertainable, observing that the requirement of numerosity of the class had been satisfied, because during the approximate class period, there were over 875,000 emergency room patients treated, of whom about 121,000 were self-pay patients.  Even though Scripps possesses all the pertinent billing and reimbursement information, the court said Kendall had not established that this information was electronically managed in a manner by which there were reasonably objective and feasible ways of identifying class members.  Although Kendall presented evidence that the Scripps computer programs had "report writer" functions available for certain parameters, Scripps had rebutted that showing with evidence that the information necessary to identify potential class members was not contained within a single information system.  Both the Eclipsys accounting software and the imaging system that dealt with hard copies of agreements and medical records would have to be utilized to obtain such information, in a lengthy process.  The court relied on evidence from Scripps's official Kehl to conclude that "individual records would need to be reviewed for hundreds of thousands of patients to determine the status of them as

12

putative class members. Further, the Eclipsys records and image records would have to be cross-referenced to determine which patient signed the Agreement at issue in this case [and] a review of insurance coverages would also need to be made on an individualized basis."

Scripps's objections to portions of the Basseen declaration were sustained for lack of foundation (addressing his characterization of emergency room charges as not representing objectively reasonable fair market valuations of services, and his description of how to obtain the requested paid claims data). The court also sustained objections to portions of the expert declaration submitted by O'Connell, concerning his conclusions about how to utilize Scripps's systems for managing patient data and records, for purposes of ascertaining class membership. The court found no foundation was shown for O'Connell's "inadmissible and unpersuasive" conclusions that the data requested about visits and payments could be obtained in about 10 hours.[7] The court relied on the analysis in *Hale II*, *supra,* 232 Cal.App.4th 50, on similar facts, finding that where overriding individualized analyses were required to determine class membership, the ascertainability requirement for a class of patients based on payment records was not satisfied. There, as here, any benefits to be gained from utilizing the class action process would be de minimis. (*Id*. at p. 61.)

---

[7]     Kendall does not make any effective attempt to show any of the evidentiary rulings were erroneous or an abuse of discretion. We accept them as operative for purposes of evaluating the arguments on appeal.

13

The trial court went on to analyze whether Kendall had demonstrated there was a well-defined community of interest in the questions of law and fact involving the potential class members. The court found he could not establish that common issues would predominate over individualized issues. The court determined that "even if [] self-pay emergency room patients received a bill for full [Charge Master] rates, there is no evidence all self-pay emergency room patients were required to pay or that Scripps exclusively sought full reimbursement of full [Charge Master] rates."[8]

In addressing Kendall's declaratory judgment causes of action, the trial court ruled that no actual controversy had been demonstrated about the terms of the Agreement for Services. The court commented that simply because Kendall "does not believe he should be required to pay [Charge Master] rates pursuant to the agreement does not create a controversy . . . between each putative class member and Defendant since that [would] require[] individualized inquiry as to how much each of those putative class members was required to pay and what a reasonable amount would be." The court relied on *Allstate Ins. Co. v. Fisher* (1973) 31 Cal.App.3d 391, 395 in concluding declaratory relief in this case would provide findings that were only cumulative to the underlying determinations requested under the CLRA and UCL. Kendall appeals the order.

---

8    Because of its conclusions on the lack of predominance of common questions, the trial court was not required to decide two other factors on community of interest, the typicality of the class representative and the adequacy of his representation. (*Thompson v. Automobile Club of Southern California* (2013) 217 Cal.App.4th 719, 727 (*Thompson*).) No issues on appeal exist on those factors.

14

## DISCUSSION

## I

### *STANDARDS RELATING TO CLASS CERTIFICATION DECISIONS*

" 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' " (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On Drug Stores*); *Hale II*, *supra*, 232 Cal.App.4th at p. 57.)  Since group litigation has the potential to create injustice, trial courts are required to " ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' " (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435.)

" 'On review of a class certification order, an appellate court's inquiry is narrowly circumscribed.  "The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion . . . ." ' " (*Hall*, *supra*, 226 Cal.App.4th at p. 291; *Brinker, supra,* 53 Cal.4th at p. 1022.)  " 'A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.  [Citations.]' [Citations.]  Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence.  [Citation.]  We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' " (*Ibid*.)

15

Class certification rulings are procedural in nature and do not decide if an action is "legally or factually meritorious." (*Linder v. Thrifty Oil Co.*, *supra*, 23 Cal.4th at pp. 439-440.)  Although the trial court must "examine the plaintiff's theory of recovery, assess the nature of the legal and factual disputes likely to be presented, and decide whether individual or common issues predominate" (*Brinker*, *supra*, 53 Cal.4th 1004, 1025), it does not resolve disputed threshold legal or factual questions, unless necessary for resolution of the class definition questions.  (*Ibid.*; *Hall*, *supra*, 226 Cal.App.4th at pp. 286-288.)  "It is far better from a fairness perspective to determine class certification independent of threshold questions disposing of the merits, and thus permit defendants who prevail on those merits, equally with those who lose on the merits, to obtain the preclusive benefits of such victories against an entire class and not just a named plaintiff." (*Brinker, supra*, at p. 1034.)

Where necessary, the trial court has some flexibility to allow amendments to class definitions that will allow an appropriate class action to be resolved on its merits.  (*Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 925-926.)  "We review the trial court's actual reasons for granting or denying certification; if they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530 (*Ayala*).)  However, "[a]ny valid, pertinent reason will be sufficient to uphold the trial court's order."  (*Thompson, supra,* 217 Cal.App.4th at p. 726.)

## II

*PREDOMINANT COMMON ISSUES REQUIREMENT:  CLRA AND UCL*

### A.  Introduction

Kendall seeks relief under CLRA statutory principles prohibiting unconscionable contract terms.  (Civ. Code, § 1770, subd. (a)(19).)  He also cites to Civil Code section 1770, subdivision (a)(5), (13) and (14), prohibiting the furnishing of goods or services through misrepresentations, misleading statements of fact, or imposition of illegal obligations. The CLRA relief sought includes compensatory and punitive damages, along with injunctive relief, as well as attorney fees.  These CLRA allegations serve as the predicate or "borrowed" other law being violated, under the UCL.  (*Hale I*, *supra*, 183 Cal.App.4th at pp. 1382-1383; *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)  The UCL relief sought includes restitution and disgorgement of funds, along with an injunction and attorney fees.

In addition to the class action requirements set forth in Code of Civil Procedure section 382, the CLRA also requires consideration of whether it is impracticable to bring all members of the class before the court.  (Civ. Code, § 1781, subd. (b); *Thompson*, *supra*, 217 Cal.App.4th at pp. 727-728.)  " ' " 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " ' "  (*Hall*, *supra*, 226 Cal.App.4th at p. 287; *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, 1141-1142.)

On the community of interest criterion, we consider " 'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Sav-On Drug Stores*, *supra*, 34 Cal.4th at p. 326.) This process examines the plaintiff's theory of recovery and assesses what kind of legal and factual disputes about the legality of the defendant's conduct will likely be presented. (*Hall*, *supra*, 226 Cal.App.4th at p. 289.)

### B. Actual Injury or Damage

" ' "Relief under the CLRA is specifically limited to those who suffer damage, making causation a necessary element of proof." [Citation.] Accordingly, "plaintiffs in a CLRA action [must] show not only that a defendant's conduct was deceptive but that the deception caused them harm." ' " (*Hale I*, *supra*, 183 Cal.App.4th 1373, 1386.) We assume here, as there, that a patient's receipt of a hospital bill that reflects the existence of an enforceable agreement and an obligation may constitute actual injury. (*Id.* at pp. 1383-1384.)

For purposes of alleging there should be class-wide liability for conduct in violation of the CLRA and UCL, Kendall's complaint characterized Scripps's pricing, billing and collection practices for self-pay patients, at Charge Master rates, as unfair, unreasonable and unconscionable. (See *Meyer v. Sprint Spectrum, L.P.* (2009) 45 Cal.4th 634, 641 ["to bring a CLRA action, not only must a consumer be exposed to an unlawful practice, but some kind of damage must result].") At argument before the trial court, Kendall's attorney acknowledged that the common questions on obligations to pay under

18

the Agreement for Services included not only the requirements of the Agreement, but also applicable law.

Kendall now complains that the trial court relied on impermissible criteria when determining that no community of interest among class members had been shown. The court said he had failed to establish that all class members were damaged "simply by receiving a bill with the [Charge Master] rates, rather than receiving a bill with the alleged reasonable value of services provided." In this respect, the court was not making a finding that Kendall or class members would lack standing to bring a statutory claim, and was instead appropriately analyzing whether class treatment was appropriate. This required the court to make decisions on preliminary legal issues relevant to class certification. (*Brinker*, *supra*, 53 Cal.4th at p. 1025.)

When an Agreement for Services is signed, the proposed treatment is unknown, as is its cost. The trial court was presented with threshold determinations, for certification purposes only, on whether an ascertainable group of class members had common interests in obtaining relief for injury occurring when they received their initial bills that referenced Charge Master rates. The gravamen of the alleged wrongs drives the analysis of the appropriate definition of a class who may seek remedies to address those wrongs. We next examine the record on the validity of Kendall's evident assumption that the publicly available Charge Master rates provide accurate benchmarks that allow class-wide estimates and determinations of patient liabilities to pay for treatment rendered.

19

C.  Evidence on Billing and Payment Processes

Scripps's senior director of patient financial services, Kehl, testified at his deposition that he oversees the business office's departments, including collections and customer service, electronic data interchange, and transactions or revenue management, each of which has its own manager.  The business office works with other Scripps departments, including the health information department, which is responsible for maintaining the standard Charge Master system and medical records.  There is one Eclipsys patient accounting system for Scripps, but each hospital has its own segment of that Eclipsys system.  Billing to patients states the applicable service areas, such as room and board or laboratory work, and lists them at standard Charge Master rates.  The bills do not list specific line items of treatment, but only basic service areas.

Typically, if patients do not give the emergency room staff any insurance information up front, then they will be registered as self-pay patients.  Once a self-pay patient is discharged from the emergency room, the first billing item that he or she would get, within three days of discharge, would be an informational statement that has no charges, payments, or adjustments on it, and instead has the words superimposed over the front, "This is not a bill."  The statement shows what information Scripps has in the patient accounting system, asking the person to call and correct incorrect items.

Kehl testified that such a self-pay patient would, 15 days after that initial letter, receive the first patient statement with charges, and could render payment.  Another bill would go out roughly 30 days after the 15-day bill, reflecting any payment activity or other adjustments that had been made since the first bill, that were manually input into

20

the patient accounting system for that specific patient. To record any such payment activity or adjustments, the accounting system breaks down reimbursements by using about 25 different codes to identify patient payments made (a) at the facilities, (b) by credit cards online, (c) received over the phone by customer service staff, and (d) mailed payments. Only a total adjustments number will show up on a patient's bill, but specific adjustments are input into the Eclipsys system to reflect contractual or charity adjustments. Scripps uses outside vendors for billing purposes and also has an internal collections department for obtaining reimbursement to adjust bills, from insurance companies and other programs such as Medicare and Medi-Cal. Kehl also testified that if an account were sent to an outside collections agency, the Eclipsys system would make a notation of that action, and the bills would be written off the accounts receivable, but not removed from the Eclipsys system.

In his declaration prepared after the deposition, Kehl described the Charge Master that Scripps, like all California hospital systems, is required to use to make public a comprehensive listing of items that are billed by the hospital to a payer or patient. He states that the Charge Master list in effect during Kendall's July 2013 visit contained over 60,000 different line items, each relating to specific or bundled procedures, services, and goods. The charges on the list are individually derived by Scripps. During the billing process, "Scripps's billing employees are trained to work with patients to help them determine whether there might be coverage for the medical bills through private insurance, governmental programs, or other financial assistance programs, even if they do

not affirmatively request it at the time they seek treatment." Discounts may be afforded for qualifying patients by comparing their incomes to the federal poverty level.

Kehl explained that because of the complexity of the financial adjustments required, Scripps would have to conduct "an individual inquiry into hundreds of thousands of patients' records" "to figure out what a patient has paid for his/her encounter, if anything, or to assess whether the patient later qualified for Medicare, CMS [Medicaid], or other governmental assistance program. . . . The same is true if Scripps were asked whether and to what extent a patient was offered and accepted any discount based on any financial assistance or charity program, and the resulting payments made, if any."

On the subject of placing a value on medical services rendered, Scripps submitted declarations from an expert health policy consultant, Tzvi Hefter, and Michael Heil, a health care management consultant. They disagreed with the conclusory statements by Kendall's experts about the accuracy of using an overall cost-to-charge ratio, obtained from OSHPD, to determine what emergency room care actually costs and therefore what reasonable charges for such services would be. Hospitals report their cost and charge data to OSHPD, but such reports do not provide sufficient information for determining the actual costs of providing particular services to particular patients. OSHPD does not ask hospitals to determine costs at a particular charge or revenue code level, because that would be impractical. A typical Charge Master document has between 10,000 to 20,000 individual charges listed, and there is no regulatory or business requirement that a hospital create any breakdown of actual costs for each individual charge. The actual cost

22

of rendering services to any particular patient usually involves resources from different cost centers, which have both fixed and variable costs. There is no direct correlation between each charge that a hospital makes and the actual costs it incurs for services provided.

### D. Reasonableness of Charge Master or Other Rates

Kendall argues that the Charge Master rates appearing on bills are unlawful or unconscionable as applied to self-pay patients, because his expert calculates that those rates are an average of four to five times the actual costs of delivering the services. His expert also calculated that the Charge Master rates amount to more than double of what Scripps actually receives as reimbursement from different categories of patients and programs. Kendall points out that Scripps is a nonprofit entity and contends that such status should preclude high charges for its services.

We first observe that Kendall's argument continues to disregard the trial court's rulings that sustained Scripps's objections to portions of the Basseen and O'Connell declarations, as making statements without adequate foundation. Although Kendall argues that more evidence was provided to the court than in the case of *Hale II*, *supra*, 232 Cal.App.4th 50, not all of his proffered evidence was admissible, and not all of it favored his position. Scripps's objections were sustained to the Basseen and O'Connell declarations, to the extent that they gave opinions without foundation (e.g., how to determine reasonable value of services based on paid claims data; how to extract data). Kehl's declaration explained that Kendall's proposed means of identifying the proposed class had misinterpreted his own deposition testimony about the existence and

capabilities of a "report writer" function. Kendall has no evident basis to argue that his experts know more about Scripps's electronic data system and how it can be manipulated than do its own managers and experts. It is not enough for Kendall to repeat his experts' conclusory statements here, without showing how the trial court erred in sustaining the objections to them. (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1168-1169 [evidentiary rulings subject to trial court's discretion].)

There is authority that the reasonable value of medical services is a factual issue to be determined by the trier of fact, considering not only costs but also reimbursement rates and other relevant information. (*Children's Hospital, supra,* 226 Cal.App.4th at pp. 1274-1275.) That case did not involve a class of self-pay patients, but rather was a dispute between a hospital and a health care benefits program, about how to determine the reasonable value of certain medical services the hospital provided to covered patients, during a time period when there was no existing written contract in effect. It was in that context that the court was discussing evidentiary factors for determining the amount of compensation at stake. (*Id*. at p. 1264.) In a proper case, the courts will have authority " 'to set specific reimbursement rates under theories of quantum meruit and the jurisdiction to enforce a reimbursement determination on both the provider and the health plan.' " (*Id.* at p. 1273.) That authority does not support a conclusion that class treatment to resolve such specific questions for patients is appropriate.

Kendall seeks to have a legal ruling issued on reasonableness or unconscionability grounds, to tie the charges billed to those self-pay patients who lack any coverage, to reimbursement rates received from patients who do have coverage. However, to make a

24

showing that the price term of the Agreement for Services is substantively unconscionable, Kendall must provide a context about the basis and justification for the price, which may include similar prices for similarly situated patients. (See *Moran v. Prime Healthcare Management, Inc.* (2016) 3 Cal.App.5th 1131, 1148 (*Moran*).) "In addition, 'courts consider not only the market price, but also the cost of the goods or services to the seller [citations], the inconvenience imposed on the seller [citation], and the true value of the product or service.' " (*Ibid.*)

The expert evidence provided by Scripps greatly undermines Kendall's proposed pure legal analysis, by showing that hospital costs will vary, depending on economies of scale and other relevant factors. During the provision of care, costs incurred sometimes exceed the reimbursement amounts received from government or insurance benefit systems. Imposition of liability to pay for services will vary, based on policies developed by providers for dealing with insurance or governmental benefit reimbursement rates. Kehl stated that in the bills sent to individual patients, "the line-items are individually generated. Itemized billing statements for each patient visit can range from one page to hundreds of pages long for each individual encounter. A patient may have insurance coverage, but not have coverage for particular services at issue. For example, some line items may be excluded from coverage or a particular hospital stay could be excluded due to coverage exclusions . . . . In order to differentiate a patient with insurance coverage from a self-pay patient under these circumstances, an individual review of every patient's account would have to be conducted to determine the reason for lack of payment. . . .

This could include a manual review of scanned documents in [imaging hard copy system File CD] for hundreds of thousands of Scripps patients' individual accounts."

Once the accounts were reviewed, individualized analyses would then be necessary on how a self-pay patient should be held financially responsible, compared to other patients. As explained in *Children's Hospital*, *supra*, 226 Cal.App.4th 1260, "the facts and circumstances of the particular case dictate what evidence is relevant to show the reasonable market value of the services at issue, i.e., the price that would be agreed upon by a willing buyer and a willing seller negotiating at arm's length. Specific criteria might or might not be appropriate for a given set of facts." (*Id*. at p. 1275.) Moreover, " '[A] medical care provider's billed price for particular services is not necessarily representative of either the cost of providing those services or their market value.' [Citation.] Rather, the full billed charges reflect what the provider unilaterally says its services are worth. In a given case, the reasonable and customary amount that the health care service plan has a duty to pay 'might be the bill the [medical provider] submits, or the amount the [health care service plan] chooses to pay, or some amount in between.' " (*Ibid*.)

In *Hale II*, *supra*, 232 Cal.App.4th 50, this court rejected the class proponent's claims that the amount of regular rates that could properly be billed could be established on a class-wide basis through the use of " 'a fixed percentage of the Chargemaster rates.' " (*Id*. at p. 65.) The class proponent was unable to show it would be easy to calculate such rates, and also could not show that "shortcutting the determination of liability" would allow the hospital to present all its proper defenses. (*Id*. at p. 66.) Here too, it is

26

unrealistic for Kendall to suggest that a class-wide reduction in fees can be ordered as a matter of law, based on a proposed percentage of the Charge Master rates, because substantial evidence is required to establish commonality of issues on liability, such as entitlement to damages or restitution.

It is significant here that under the UCL, conduct permitted by statute is not to be declared illegal by the courts: " ' "There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful." ' " (*Hale I*, *supra*, 183 Cal.App.4th at p. 1380.) The Health and Safety Code permits Scripps to create, report and publicize its Charge Master rates, and section 1317, subdivision (d) requires patients to sign an agreement that acknowledges payment obligations under those terms. Section 127444 directs that this body of law be construed to require hospitals to give notice of their uniform Charge Master or published rates before communicating them to patients. (*Moran, supra,* 3 Cal.App.5th 1131, 1141-1142 [Hospital Fair Pricing Policies Act requires licensed hospitals to promulgate written policies on discount and charity payments; § 127405, subd. (a)(1)(A)].) Pursuant to its section 127443, the rights and remedies created by this Act are intended to be cumulative and not to supersede other legal rights and remedies. The Agreement for Services legitimately begins the billing process, and the process allows for various adjustments and credits to be made on an individualized basis.

As Kendall originally defined the proposed class, individualized inquiries would be necessary to calculate liability and damages, by generating a hypothetical reasonable rate for emergency services, and determining what portion of it each patient should be

27

held liable to pay, after treatment was completed. The evidence showed that numerous factors affect the amounts that will be sequentially billed, depending on later findings about availability of coverage from insurance, governmental benefits, charity or discounts. In Kendall's newly proposed amended class definition, he appears to be focusing on alleged injury in fact that occurs promptly upon a patient's receipt of a bill at Charge Master rates. His new definition "would be based on to whom the hospital sent its billing, rather than who made the payment on the individual patient's account," such as a paying entity (e.g., Medicare, Medi-Cal, or commercial insurers).

Even if we accept that Kendall actually presented his proposed amendment to the trial court, which is not entirely clear from the record, it would not solve the existing problems about a lack of community of interest among class members on actual injury incurred. An emergency patient cannot anticipate the extent of treatment that will be needed until stabilization. Likewise, the extent of the enforceability of each patient's bill will be determined over time. Kendall has raised only speculation that each and every bill will go to the collections stage, or that harassment or improper practices may occur. (Civ. Code, § 1788.1 [purposes of California Fair Debt Collection Practices Act include preventing unfair or deceptive collection practices].) There are presumably different levels of creditworthiness among self-pay patients and thus potentially different levels of damage among class members.

We conclude the trial court had a sufficient basis in the record to determine that class certification was not an appropriate format for pursuing the imposition of a legal duty upon Scripps to refrain from utilizing the Charge Master billing information, in its

28

initiation of billing and collection activity. Any reasonable value determinations concerning the services provided to Kendall and to putative class members must involve considerations not only of the individual variations among the patients' treatment, but of the effect of regulatory schemes, all of which are beyond the scope of the current pleadings to resolve.

Even accepting that "the power to reach the merits as part of the certification process is at most a discretionary power to be employed in exceptional cases" (*Hall*, *supra*, 226 Cal.App.4th at p. 296), we see no indication the trial court overreached by going to the merits when denying the requested class certification. The trial court did not dismiss the action as a whole, but properly analyzed the class allegations to find that the required community of interest had not been shown to exist. Substantial evidence supports its analysis.

### III

### *ASCERTAINABILITY REQUIREMENT: CLRA AND UCL*

"Whether a class is ascertainable is determined by examining (1) the class definition, (2) the size of the class, and (3) the means available for identifying class members." (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1271.) " ' " 'Class members are "ascertainable" where they may be readily identified without unreasonable expense or time by reference to official records.' " ' " (*Thompson*, *supra*, 217 Cal.App.4th at p. 728.) " 'Class certification is properly denied for lack of ascertainability when the proposed definition is overbroad and the plaintiff offers no means by which only those class members who have claims can be identified from those

29

who should not be included in the class.' " (*Hale II*, *supra*, 232 Cal.App.4th at pp. 58-59; *Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 7.)

Kendall contends that either his original class definition, or his proposed amendment, sufficiently identifies an ascertainable class that is not overinclusive. In his experts' declarations, he proposed methods for analyzing Scripps's records for billing and payments, to identify class members who have claims based on the allegedly excessive Charge Master billings. (See *Thompson*, *supra*, 217 Cal.App.4th at pp. 727-728 [overbroad class definitions may be rejected].) He argues that the trial court erroneously imposed a burdensome "administrative feasibility" requirement, beyond what California law allows. (*Nicodemus*, *supra*, 3 Cal.App.5th at pp. 1216-1217 [identifying different mechanisms that were available to find and give notice to class members].) He contends that if the class as currently defined is overbroad, such problems can be dealt with at a later time (e.g., through subclasses). (See *Aguiar v. Cintas Corp. No. 2* (2006) 144 Cal.App.4th 121, 136.) Alternatively, he requests that if the current class definition is too broad, we should reverse the order with instructions to allow him to modify his class definition. Kendall also questions whether any notice to the class members is actually necessary for his requested decrees.

Where the administrative cost to identify and process certain self-pay patients' claims would be " 'so substantial to render the likely appreciable benefits to the class de minimis in comparison,' " the trial court has the discretion to deny the class certification request. (*Hale II*, *supra*, 232 Cal.App.4th at p. 61.) Scripps showed, through its financial services director Kehl's deposition and declaration, that even though a financial

30

department manager could run a database inquiry to obtain certain information, Scripps does not have an expert in running database inquiries. When its managers utilize the report writer function to input the specifics that identify the data elements to be examined concerning a particular visit, "you have to be very specific as to the exact fields and the pathway that you're in to get to those fields, *if they are attainable.*" (Italics added.) It is not appropriate to require Scripps to create new computer programs to satisfy Kendall's demands. (See *id.* at pp. 67-68.)

Kendall cannot explain how potential self-pay class members, who have claims of injury from their receipt of bills containing allegedly excessive Charge Master amounts, can be found through his suggested methods and then distinguished from those patients who should not be included in the class (e.g., if the nonmembers' care costs were ultimately subject to discounting or payment in full by insurers, governmental benefits providers, or charity). The trial court correctly determined from the evidence that Kendall did not show the existence of a reasonable method for Scripps "to ascertain who has claims and who does not without an individualized analysis of each patient's payment record." (*Hale II*, *supra*, 232 Cal.App.4th at p. 59.)

In view of Kendall's shifting theories about whether receipt of billing alone creates class-wide damage to self-pay patients, and whether data on patient payments or other reimbursements received for services are even relevant to defining the class, it is difficult to make any realistic evaluation of the ascertainability criterion. Neither the trial court nor this court can issue advisory opinions on a class basis about how to solve the serious affordability problems in the health care industry, which are matters of public policy

31

much in the news and commonly considered to be subject to legislative and executive controls. There was no abuse of discretion in the ruling denying certification of the class on this ground.

IV

*RELATIONSHIP OF DECLARATORY RELIEF AND STATUTORY CLAIMS*

A. Introduction to Theories Pled

" ' " 'The purpose of a declaratory judgment is to "serve some practical end in quieting or stabilizing an uncertain or disputed jural relation." [Citation.] "Another purpose is to liquidate doubts with respect to uncertainties or controversies which might otherwise result in subsequent litigation [citation]." [Citation.]' [Citation.] " 'One test of the right to institute proceedings for declaratory judgment is the necessity of present adjudication as a guide for plaintiff's future conduct in order to preserve his legal rights.' " ' " (*Moran, supra,* 3 Cal.App.5th 1131, 1153.)

In pleading his causes of action for declaratory judgments, Kendall incorporates his previous allegations from his CLRA and UCL claims and contends he is entitled to a declaration of rights and duties about the binding effect of the price terms of the Agreement for Services. He contends the declaratory relief allegations are stand-alone causes of action that should justify the issuance of a declaration as to the meaning of a single contract provision, which he interprets as allowing only the reasonable value of services to be billed to self-pay patients. Alternatively, he seeks a declaration that the Charge Master rates are grossly excessive or unconscionably high, when measured against the backdrop of CLRA and UCL statutory law. He contends each cause of action

32

should be analyzed separately for its relevant class action standard, and that federal rules would permit him to obtain declaratory relief without regard to California requirements of community of interest and ascertainability of the class.

Although the language of the Agreement for Services is common to all class members, and they were all charged the Charge Master rates, Kendall is not pleading breach of contract. That was an appropriate concession under *Hale I, supra,* 183 Cal.App.4th 1373, 1387, in which this court sustained a demurrer ruling to disallow a former patient from bringing a breach of contract action based upon one hospital's agreement for services. By failing to pay more than a token amount toward her bill, that patient had failed to establish the contractual element of performance or excuse from performance. (*Ibid.*) Kendall also has not shown he paid anywhere close to the reasonable value of services he received.[9]

Instead, Kendall pursues a contract interpretation through declaratory relief, to settle the legality of Scripps's billing behavior with respect to the class as a whole. In addition to his contractual arguments, he cites to CLRA statutory principles prohibiting unconscionable terms. (Civ. Code, § 1770, subd. (a)(19).) Even though Kendall says he does not seek certification of CLRA class on declaratory relief, he still relies on all the CLRA allegations both as a declaratory relief foundation, and to serve as the predicate or "borrowed" other law being violated as the UCL claim alleges. (*Hale I, supra,* 183

---

[9] One of Kendall's declaratory relief theories is that he should not be required to apply for financial assistance before challenging the Charge Master rates, although that particular issue has not been argued on appeal. (See *Sarum v. Dignity Health* (2014) 232 Cal.App.4th 1159, 1169 [some burden is involved in applying for financial assistance].)

Cal.App.4th at pp. 1382-1383; *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., supra,* 20 Cal.4th at p. 180.)

## B. Alternative FRCP Rule 23 Analysis

Kendall argues the trial court applied the wrong standard to determine the class certification question for declaratory relief, when it focused on California law requiring ascertainability and the predominance of common issues. Instead, Kendall seeks to have this court analyze his request pursuant to the requirements of FRCP rule 23(b), on the grounds that California law does not provide adequate guidance in this area. (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 692, fn. 12 ["In the absence of relevant state precedent, trial courts are urged to follow the procedures set forth in rule 23 of the [FRCP] for conducting class actions"]; *Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 823–824 (*Carter*) ["California class actions can neither be certified pursuant to [FRCP] Rule 23(b)(2) [] nor barred from certification by the rule," but FRCP rule 23(b)(2) provisions are advisory].) For example, lawsuits challenging as illegal certain system-wide practices or policies, affecting all putative class members, may proceed under federal standards giving a broad interpretation to the community of interest requirement. "In such circumstances, individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." (*Capitol People First*, *supra*, p. 691, fn. 11; see *Armstrong v. Davis* (9th Cir. 2001) 275 F.3d 849, 868.) This federal rule certification approach will accommodate cases in which all class members have suffered similar harm from a systemic failure to accommodate their situations, and where prosecution of

separate actions would be so difficult as to be impossible. (*Capitol People First, supra,* at p. 691, fn. 12; *In re Yahoo Mail Litigation* (N.D. Cal. 2015) 308 F.R.D. 577, 582 [alleging class-wide violations of state and federal wiretapping laws and seeking injunctive relief].)

As a licensed hospital, Scripps is required to refrain from discriminating against persons seeking emergency services on the basis of their personal characteristics or their ability to pay for medical services. (§ 1317, subds. (b), (d) [emergency room regulations found within licensing provisions for health facilities' "other services")].) We have found no support in the record for Kendall's argument that Scripps is engaging in illegal billing behavior, after such services are rendered, that controverts applicable statutory standards for hospital billing and reimbursement. (See *Brinker*, *supra*, 53 Cal.4th at pp. 1033-1034 [evaluating the class's theory of liability that the employer's uniform policy, when measured against applicable legal requirements such as a wage order, is allegedly unlawful].) Kendall is essentially requesting an abstract contract interpretation ruling that excludes consideration of existing provisions of law that govern the financial arrangements that hospitals may make for recipients of emergency care.

Kendall suggests that under federal law, ascertainability questions need not be addressed regarding the proposed declaratory relief class, and he states that notice to class members "may never be required in this case," or that publication notice would be sufficient. But if the proposed rulings are significant enough to affect class members and their relationships with Scripps, he cannot explain why standard notice requirements should be disregarded. (*Carter, supra,* 224 Cal.App.4th 808, 823-824 [due process

concerns require notice and opt-out rights to class members unless " 'the relief sought must perforce affect the entire class at once' "].)  The ordinary notice requirements cannot be avoided simply by citing to FRCP rule 23(b).

Because of the comprehensive California case law applicable to Kendall's substantive claims under CLRA and the UCL, and the very closely related nature of his declaratory relief claims, we see no need to look to federal law for guidance in evaluating his requests for certification of the declaratory judgment causes of action.  Kendall has not identified any characteristics of the proposed class, such as financial status, that cannot properly be analyzed through the use of California law, with regard to his declaratory relief arguments.  (*Bell v. American Title Ins. Co.* (1991) 226 Cal.App.3d 1589, 1602-1603.)  This record did not require the trial court to expressly discuss or apply FRCP rule 23.

### C.  Analysis

" '[F]or purposes of certification, the proper inquiry is "whether the theory of recovery advanced by the plaintiff is likely to prove amenable to class treatment." ' " (*Hall*, *supra*, 226 Cal.App.4th at p. 292.)  Kendall believes that the Agreement for Services lacks any valid price term, as a matter of pure contract interpretation, and instead, the Agreement for Services should not be permitted to make references to Charge Master billings.  He invokes equitable principles of quantum meruit and suggests the court apply a flat percentage reduction from the gross Charge Master charges, to arrive at the reasonable value of the services rendered, through a comparison of the Charge Master rates either to the hospital's costs in providing services, or to the reimbursement rates for

36

various categories of patients covered by other benefits plans. This approach would effectively place the burden on Scripps to prove the value of its services before billing for them.

Kendall finds support for his position in a demurrer case, *Moran, supra,* 3 Cal.App.5th 1131, 1142. There, the court observed that the Hospital Fair Pricing Policies Act (§ 127400 et seq.) "imposes on licensed hospitals the requirement that they establish, give notice of, and administer financial aid and charity care policies, and allows a hospital to bill for treatment and services based on its own schedule of fees. However, it does not preclude claims based on what a patient allegedly expected to pay or authorize costs that are allegedly exorbitant. Consequently, the Act neither ' "bar[s]" [an] action' under the UCL, nor does it 'clearly permit' a hospital to charge self-pay emergency care patients 'artificial and grossly excessive rates.' " (*Moran, supra,* at p. 1142; § 127444 [hospitals must give notice of uniform Charge Master or published rates].)

For the class as presently defined, the certification decision on the declaratory relief theories must also take into account Kendall's pleaded statutory claims. Assuming patients are exposed to financial liability upon receiving notice of the billed amounts, there are many other factors that may affect Scripps's potential liability to each patient for the allegedly wrongful billing practices. Some self-pay patients are ultimately determined to be eligible for some kind of insurance, governmental benefits coverage, or charity or discount assistance. (See *Children's Hospital, supra,* 226 Cal.App.4th at p. 1278 [factual disputes remained about "reasonable and customary value" of hospital services, when accepted payments had varied, depending on contracted-for insurance

37

charges and government reimbursement rates].) There are significant remaining factual and logistical problems in identifying members of the proposed class, for purposes of ascertaining their identity and billing status.

Nor does Kendall's proposed modification of the class definition, to restrict it to all self-pay patients who received bills from Scripps and omit any further consideration of whether some other entity made payments on the individual patient's account, make this a proper declaratory relief request. Kendall can show no support for his theory that, "at the very least," the trial court should have discussed and certified a declaratory relief "issue" class with respect to his contractual interpretation and/or unconscionability claims. (Cal. Rules of Court, rule 3.765(b) ["[w]hen appropriate, an action may be maintained as a class action limited to particular issues"].) The court did not find it was appropriate to do so, based on the type of generalized decrees being requested and the availability of other forms of relief, and this was a reasonable determination under the circumstances.

Certifying a class to issue declaratory relief, that would resolve the proper extent of some self-pay patients' remaining contractual and equitable payment obligations, could not properly be granted in a theoretical vacuum that disregards not only the related substantive statutory claims, but also the existence of specialized regulations of emergency services billing that allow the use of the Charge Master format. (§ 1317, subd. (d) [allowing emergency room patients to be required to sign an agreement to provide information on payment options; § 1339.51 [notifications on allowable Charge Master rates]; § 127444 [uniform charges allowed under Hospital Fair Pricing Policies Act].) Under Code of Civil Procedure section 1061, the trial court could appropriately

38

refuse to exercise the power to grant declaratory relief, where it was unnecessary or inappropriate under all of the circumstances.  This was a discretionary decision within the authority of the court, and it will not be disturbed on appeal.  (*Allstate Ins. Co. v. Fisher*, *supra*, 31 Cal.App.3d at p. 395.)

## DISPOSITION

The order is affirmed.  Costs on appeal to Scripps.


HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.

Filed 10/23/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| PAUL KENDALL, | D070390 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2013-00073680-CU-BT-CTL) |
| SCRIPPS HEALTH, | |
| Defendant and Respondent. | ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed October 18, 2017 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to California Rules of Court, rule 8.1120(a), for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

McCONNELL, P.J.

cc:  All Parties